No. 06-35333

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

SARAH GREENE, personally and as next friend for S.G., a minor, and K.G., a minor,

     Plaintiff-Appellant,

        v.

BOB CAMRETA; DESCHUTES COUNTY; JAMES ALFORD, Deschutes County Deputy Sheriff; BEND LAPINE SCHOOL DISTRICT; TERRY FRIESEN,

     Defendants-Appellees.

PETITION FOR PANEL REHEARING WITH SUGGESTION FOR

REHEARING EN BANC

Appeal from the United States District Court
for the District of Oregon

JOHN R. KROGER
Attorney General
JEROME LIDZ
Solicitor General
DAVID B. THOMPSON
Senior Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402

Attorneys for Appellee
Bob Camreta

# TABLE OF CONTENTS

A.    Background ...................................................................................5

B.    The in-school interview should be analyzed under *Terry v. Ohio*'s balancing approach; rehearing is warranted on that question. ..................................................................................7

    1.    *Terry v. Ohio*'s balancing approach applies to temporary investigative detentions. ......................................8

        a.    *T.L.O.* provides the framework for the required balancing of interests in the public school setting. ...................................................................10

        b.    *Lidster* makes clear that the *Terry* balancing approach applies to a temporary detention of a potential witness, as occurred in this case.................12

        c.    *Lidster* and *T.L.O.* apply to this case..........................14

    2.    The panel should grant rehearing to reconsider its conclusion that *Terry*'s balancing approach does not apply...............................................................................14

    3.    This court should grant rehearing *en banc* to harmonize this decision with *Lidster*, *T.L.O.*, and *Ferguson*. ..........................................................................18

CONCLUSION....................................................................................20

APPENDIX

    United States Court of Appeals' Opinion,
    *Greene v. Camreta, et al*, USCA No. 06-35333 ............................. App.-1

# TABLE OF AUTHORITIES

## Cases

*Brigham City v. Stuart*,
    547 U.S. 398 (2006) ................................................................8

*Brown v. Texas*,
    443 U.S. 47 (1979) ...............................................................10

*Calabretta v. Floyd,*
    189 F.2d 808 (9th Cir. 1999) ................................................................19

*Doe v. Bagan,*
    41 F.3d 571 (10th Cir. 1994) ..........................................................5, 6

*Dunaway v. New York,*
    442 U.S. 200 (1979) ....................................................................8, 9, 10

*Ferguson v. City of Charleston,*
    532 U.S. 67 (2001) ........................................... 15, 16, 17, 18, 19

*Greene v. Camreta,*
    06-35333, slip op. at 16310 (9th Cir. Dec. 10, 2009) ................................4

*Illinois v. Lidster,*
    540 U.S. 419 (2004) .................................. 4, 10, 12, 13, 14, 15, 16, 18, 19

*Indianapolis v. Edmond,*
    531 U.S. 32 (2000) .................................................................12, 13

*Kidd v. Ashcroft,*
    580 F.3d 949 (9th Cir. 2009) ............................................................16

*New Jersey v. T.L.O.,*
    469 U.S. 325 (1985) ........................................ 6, 10, 14, 15, 16, 17, 18, 19

*Terry v. Ohio,*
    392 U.S. 1 (1968) ............... 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18

*United States v. Kincaid,*
    379 F.3d 813 (9th Cir. 2004) ............................................................15

*United States v. Knights,*
    534 U.S. 112 (2001) ..........................................................................8

*Vernonia School District 47J v. Acton,*
    515 U.S. 646 (1995) ..........................................................................12

## Constitutional and Statutory Provisions

42 U.S.C. § 1983 ..............................................................................2

U.S. Const. Amend. IV .. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19

## Other Authorities

Fed. R. App. P. 35 ............................................................................1

Fed. R. App. P. 40.................................................................................................1

# PETITION FOR PANEL REHEARING WITH SUGGESTION FOR REHEARING EN BANC

Pursuant to Fed. R. App. P. 35 and 40, defendant-appellee Bob Camreta moves for panel rehearing or, in the alternative, rehearing *en banc*.

As the panel recognized, this case presents a Fourth Amendment question of exceptional importance and of first impression in this circuit. The panel held that a social services caseworker and a deputy sheriff violated the Fourth Amendment when—without a warrant, court order, exigent circumstances, or parental consent—they jointly interviewed a child at her public school about suspected sexual abuse by her father. Whether that is correct or whether the more flexible balancing approach yields a less demanding standard is a question that warrants rehearing *en banc*. Further, panel rehearing or rehearing *en banc* is warranted because the panel's rejection of the balancing approach conflicts with Supreme Court decisions requiring that approach here.

In this case, police officers received information that a father might be sexually abusing his two daughters: the children's mother had expressed concerns about his interactions with the girls to an acquaintance. The Oregon Department of Human Services (DHS) became aware of those concerns and assigned a DHS caseworker to assess the girls' safety. Based on the hearsay about abuse, which was far from the probable cause needed to obtain a warrant,

the caseworker, accompanied by a deputy sheriff, went to the public elementary school of one of the girls to talk to her. There, they had the child removed from class and interviewed her in a private office about the possible abuse by her father. Subsequently, the child, through her mother, sued the caseworker and the deputy under 42 U.S.C. § 1983 for an alleged Fourth Amendment violation.

According to the panel, the circumstances of the in-school interview amounted to a Fourth Amendment seizure of the child, to which the warrant and probable cause requirements applied. The panel held that in-school interviews of a suspected victim of child abuse (a crime), like that which occurred here, are unconstitutional if conducted in the absence of a warrant, probable cause coupled with exigent circumstances, or the consent of the child's parents (one of whom may be the suspected abuser). The panel's decision essentially invalidated a routine and (until now) simple investigative technique.

In other cases, this court has correctly recognized that "reasonableness" is the touchstone of the Fourth Amendment, and that not all seizures or searches must be supported by a warrant or by an exception to the warrant requirement. Interviewing the victim of a possible crime, especially a child, is reasonable government conduct. The Supreme Court has repeatedly recognized that there are legitimate reasons why not every encounter between a government official

and a citizen that involves a law enforcement objective implicates the Fourth Amendment's warrant and probable cause requirements.

This is one of those situations. Here, the governmental intrusion on the suspected victim's privacy and liberty interests is relatively minimal; a student's freedom of movement and privacy are limited in the public school context. At the same time, the government's interest—to promptly and effectively investigate criminal conduct that seriously endangers the welfare of children—is great. Because child sex abuse is a crime that takes place behind closed doors, not out in the open, the opportunity to develop proof independent of the victim is remote. Investigative interviews of suspected child-abuse victims almost always occur before government officials have "probable cause" to believe the abuse has occurred. Thus, in most cases investigators would be unable to get a warrant for an in-school interview like that which occurred here.

The panel noted that it did not have to reach the Fourth Amendment issue because the caseworker and the police officer were entitled to qualified immunity based on the law not being clearly established. But the panel nevertheless chose to address that issue because "it promotes the development of constitutional precedent" in an area of "great importance." *Greene v.*

*Camreta*, 06-35333, slip op. at 16310 (9th Cir. Dec. 10, 2009) (App. 14).[1]  The

panel took on that task specifically to "provide guidance to those charged with

the difficult task of protecting child welfare within the confines of the Fourth

Amendment."  (App. 15).

Further review also is warranted because the panel's decision conflicts

with Supreme Court precedent holding that the reasonableness (balancing-of-

interests) test from *Terry v. Ohio*, 392 U.S. 1 (1968), which relaxes the

traditional warrant and probable cause requirements, applies to temporary

detentions of potential witnesses of a crime.  In rejecting the *Terry* test in favor

of the more rigorous warrant and probable cause requirements, the panel

overlooked *Illinois v. Lidster*, 540 U.S. 419 (2004).  The *Lidster* Court,

applying *Terry*, held that no Fourth Amendment violation occurred when police

briefly, and without individualized suspicion, detained potential witnesses to

gather information about a recent crime.  Here, government officials detained a

potential witness to a crime—and potential child-abuse victim—for

information-gathering purposes when they interviewed her at school.

Therefore, *Lidster*, and its application of *Terry*'s reasonableness test, controls.

_____

[1]     A copy of the panel's decision is in the appendix to this petition.
Hereafter, all citations to that decision will be to "App. ___."

In sum, the critical importance of the underlying Fourth Amendment question and the need to bring this decision into alignment with controlling Supreme Court precedent calls for panel rehearing or rehearing *en banc*.

## A.     Background

The police and Bob Camreta, a DHS caseworker, received information that Nimrod Greene might be sexually abusing his young daughters (S.G. and K.G.). (App. 4-5). Camreta went to S.G.'s elementary school with defendant James Alford, a deputy sheriff, to interview S.G. about the suspected abuse. (App. 5-6). Camreta told school officials that he and Alford were there to talk to S.G. and requested a private office for the interview. (App. 6). A school counselor went to S.G.'s class and, after telling her that someone was there to talk to her, took her to the room where Camreta and Alford were waiting. (*Id.*). The counselor then left. (*Id.*). Camreta interviewed S.G. for two hours. (*Id.*).

As noted, S.G. sued Camreta and Alford, alleging that they had seized her at school in violation of her Fourth Amendment rights. The district court granted Camreta and Alford summary judgment on that claim. (App. 12-13).

The district court ruled that although S.G. had been seized for purposes of the Fourth Amendment, no constitutional violation occurred. The court extended the analysis of *Doe v. Bagan*, 41 F.3d 571 (10th Cir. 1994), to the facts of this case. (E.R. 26-28). In *Bagan*, the Tenth Circuit considered whether the

in-school seizure of a nine-year-old boy by a social services caseworker, to interview him about his possible sexual abuse of another child, violated the Fourth Amendment. *Bagan*, 41 F.3d at 573-74. Applying *Terry*'s reasonableness test, as incorporated in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985)[2], the *Bagan* court held that no constitutional violation occurred. *Id.* at 574 n. 3. It reasoned that the seizure "was justified at its inception because a victim of child abuse had identified [the boy] as her abuser[,] [and] a ten minute interview with a social services caseworker was reasonably related in scope to determining [the boy]'s role in the incident." *Id.*

The district court concluded that, under the *Bagan/Terry* analysis, the seizure of S.G. was reasonable at its inception (supported by a reasonable suspicion that S.G. had been sexually abused by her father) and was reasonable in scope (the interview's length was justified under the circumstances). (E.R. 27-28). The court ruled alternatively that, even if the seizure was unconstitutional, qualified immunity protected Camreta and Alford from liability. (App. 13; E.R. 28-29).

---

[2]         In *T.L.O.*, the Court held that a school official's warrantless, in-school search of a student's purse, based on a reasonable suspicion that it contained evidence of a violation of the law or a school rule, did not violate the Fourth Amendment. 469 U.S. at 340-41.

On appeal, the panel rejected the district court's conclusion that the in-school seizure of S.G. was constitutional. (App. 29). But the panel agreed with the qualified immunity ruling. (App. 34). Accordingly, the panel affirmed the district court's grant of summary judgment on the Fourth Amendment claim. The panel reversed summary judgment for Camreta on two other constitutional claims. That part of the panel's decision is not at issue in this petition. Nor is the panel's qualified immunity holding. This petition focuses solely on the panel's substantive Fourth Amendment analysis.[3]

**B.     The in-school interview should be analyzed under *Terry v. Ohio*'s balancing approach; rehearing is warranted on that question.**

The panel concluded that the Fourth Amendment's warrant and probable cause requirements applied to the in-school seizure that occurred here. It held that when law enforcement is involved in an in-school seizure of a child for an interview about possible abuse by another, the seizure is unconstitutional absent a warrant, a court order, exigent circumstances, or parental consent. (App. 29). Because none of those circumstances was present here, the panel held that the

---

[3]     Whether the child was seized for purposes of the Fourth Amendment is not an issue in this petition. But not *all* in-school interviews of suspected child-abuse victims by either a social services official or a law enforcement official amount to a Fourth Amendment seizure. That will depend on the particular circumstances of the interview at issue, taking into account the inherent restrictions on a student's freedom of movement at school.

seizure violated S.G.'s Fourth Amendment right to be free from unreasonable seizures. (App. 30).

The panel should grant rehearing to reconsider its conclusion that *Terry*'s balancing approach does not apply to the in-school seizure of S.G. As explained below, that approach is required by Supreme Court precedent.

### 1.   *Terry v. Ohio*'s balancing approach applies to temporary investigative detentions.

The Fourth Amendment seizure in this case was part of a sexual-abuse investigation. S.G., the possible victim (and potential witness), was temporarily detained at a public school. The purpose of the detention and the attendant interview was twofold: (1) to gather information for a decision on whether S.G. required the state's child-protection services, and (2) to gather information for a possible criminal action against S.G.'s father.

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Thus, under the "general Fourth Amendment approach," courts examine the totality of the circumstances to determine whether a search or seizure is reasonable. *United States v. Knights*, 534 U.S. 112, 118 (2001). Traditionally, "the Fourth Amendment's guarantee against unreasonable seizures of persons was analyzed in terms of arrest, probable cause for arrest, and warrants based on such probable cause." *Dunaway v. New York*, 442 U.S. 200, 208-09 (1979). "The

term 'arrest' was synonymous with those seizures governed by the Fourth Amendment." *Id.* at 209. Therefore, under the "traditional" or "general" approach, the probable cause and warrant requirements applied to all Fourth Amendment seizures of persons, "without the need to 'balance' the interests and circumstances involved in particular situations." *Id.*

But the Supreme Court abandoned that all-inclusive view of "seizures" in *Terry*, which addressed the constitutionality of a brief "stop and frisk" of a person on the street. The Court recognized that this police conduct had to "be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry*, 392 U.S. at 20. "However, since the intrusion involved in a 'stop and frisk' was so much less severe than that involved in traditional 'arrests,' the Court declined to stretch the concept of 'arrest'—and the general rule requiring probable cause to make arrests 'reasonable' under the Fourth Amendment—to cover such intrusions." *Dunaway*, 442 U.S. at 209 (explaining *Terry*). "And to determine the justification necessary to make this specially limited intrusion 'reasonable' under the Fourth Amendment, the Court balanced the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Id.* (citing *Terry*, 392 U.S. at 22-27). The result of that balancing

approach, of course, was the now-familiar "reasonable suspicion" standard for a
*Terry* stop-and-frisk. *Terry*, 392 U.S. at 27.

In sum, *Terry* departed from traditional Fourth Amendment analysis by
"defin[ing] a special category of Fourth Amendment 'seizures' so substantially
less intrusive than arrests that the general rule requiring probable cause to make
Fourth Amendment 'seizures' reasonable could be replaced by a balancing
test." *Dunaway*, 442 U.S. at 210. To apply that test, courts balance "the gravity
of the public concerns served by the seizure, the degree to which the seizure
advances the public interest, and the severity of the interference with individual
liberty." *Brown v. Texas*, 443 U.S. 47, 51 (1979). That balancing is part of the
overall reasonableness inquiry, which "is a dual one – whether the officer's
action was justified at its inception, and whether it was reasonably related in
scope to the circumstances which justified the interference in the first place."
*Terry*, 393 U.S. at 20.

The *Terry* balancing approach is the foundation for the two Supreme
Court decisions that drive the analysis in the instant case: *New Jersey v. T.L.O.*
and *Illinois v. Lidster*.

>           a.    ***T.L.O.* provides the framework for the required
>                 balancing of interests in the public school setting.**

In *T.L.O.*, the Court considered the constitutionality of searches of
students at a public school by school officials. *T.L.O.*, 469 U.S. at 328. Citing

*Terry* and its progeny, the Court observed that "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, [the Court] ha[s] not hesitated to adopt such a standard." *Id.* at 341. The Court applied *Terry*'s twofold, reasonable-at-its-inception/reasonable-in-scope inquiry for determining the reasonableness of any search. *Id.*

Under *Terry*'s balancing test, the Court sought to strike a "balance between the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place." *Id.* at 340. The Court "join[ed] the majority of courts that have examined this issue in concluding that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law." *Id.* at 341.

Instead, "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.*

at 341-42 (footnotes omitted). The Court further held that "[s]uch a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342 (footnote omitted). The Court emphasized that "students within the school environment have a lesser expectation of privacy than members of the population generally." *Id.* at 348 (Powell, J., concurring). *See also Vernonia School District 47J v. Acton*, 515 U.S. 646, 655-57 (1995) (noting reasons why students have lesser expectation of privacy in public school).

b.   ***Lidster* makes clear that the *Terry* balancing approach applies to a temporary detention of a potential witness, as occurred in this case.**

More recently, in *Lidster*, the Court again employed the *Terry* balancing approach. There, the Court held that the brief, suspicionless detention of motorists at a police checkpoint to determine if they had witnessed a recent hit-and-run accident in the area was constitutional. *Lidster*, 540 U.S. at 421-22.

The Court began by distinguishing the police checkpoint from the one that violated the Fourth Amendment in *Indianapolis v. Edmond*, 531 U.S. 32 (2000). "*Edmond* involved a checkpoint at which police stopped vehicles to look for evidence of drug crimes committed by occupants of those vehicles." *Lidster*, 540 U.S. at 423. The *Edmond* Court "found that police had set up this

checkpoint primarily for general 'crime control,' *i.e.*, 'to detect evidence of ordinary criminal wrongdoing.'" *Id.* (quoting *Edmond*, 531 U.S. at 41). "[T]he Fourth Amendment forbids such a stop[, made without individualized suspicion], in the absence of special circumstances." *Id.* (citing *Edmond*, 531 U.S. at 44). But in *Lidster*, the Court emphasized, the checkpoint's primary purpose was not to investigate the occupants of the stopped vehicles (as in *Edmond*); instead, it was to ask for their assistance in solving a crime likely committed by someone else:

> The checkpoint stop here differs significantly from that in *Edmond*. The stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others. The police expected the information elicited to help them apprehend, not the vehicle's occupants, but other individuals.

*Lidster*, 540 U.S. at 423 (emphasis in original).

Having distinguished *Edmond*, the *Lidster* Court applied the *Terry* balancing test to determine the reasonableness of the information-gathering checkpoint at issue. The Court first observed that "[t]he Fourth Amendment does not treat a motorist's car as his castle." *Lidster*, 540 U.S. at 424. It then noted that "[t]he relevant public concern was grave[;] [p]olice were investigating a crime that had resulted in a human death." *Id.* at 427. Finally, "the stops interfered only minimally with liberty of the sort the Fourth

Amendment seeks to protect," given that each stop was brief and "provided little reason for anxiety or alarm." *Id.* at 427-28. Balancing those factors, the Court held that the suspicionless seizure of the motorists was constitutional. *Id.* at 428.

> ### c. *Lidster* and *T.L.O.* apply to this case.

Here, a student was seized at a public school for the purpose of gathering information from her about suspected sexual abuse (a crime) by someone else: her father. Insofar as that seizure had a law enforcement purpose, this case is just like *Lidster*. S.G. has the very same status—potential witness—as the motorists in that case. *Lidster* makes clear that *Terry*'s balancing approach applies when determining whether the seizure of a potential witness—on less than probable cause—comports with the Fourth Amendment. And *T.L.O.*, because it applied *Terry* to the public school setting, provides the framework for the balancing of interests that must be conducted in assessing the constitutionality of S.G.'s in-school seizure.

> ## 2. The panel should grant rehearing to reconsider its conclusion that *Terry*'s balancing approach does not apply.

The panel neither cited nor discussed *Lidster*. Although Camreta cited *T.L.O.* and *Terry* to the panel, and argued for *Terry* balancing, he did not cite *Lidster*. That oversight may have contributed to the panel's rejection of *Terry*'s balancing approach (as applied in *T.L.O.* and *Lidster*) and its adoption of the

warrant/probable cause standard instead. In any event, for the following reasons the panel should grant rehearing to reconsider its Fourth Amendment analysis.

The panel believed *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), precluded application of *T.L.O./Terry* balancing. (App. 23-25). Yet nothing in *Ferguson* precludes application of the balancing approach in this case. *Ferguson* held that the reasonableness test applied in the Supreme Court's "special needs" cases—which "employed a balancing test that weighed the intrusion on the individual's interest in privacy against the 'special needs' that supported the particular program" at issue—is inapplicable to searches that involve a law enforcement purpose. *Ferguson*, 532 U.S. at 78. Viewing *T.L.O.* as one of the "special needs" cases considered in *Ferguson*, the panel deemed *T.L.O.* essentially irrelevant to the Fourth Amendment analysis in this case. (App. 23). And based on the involvement of law enforcement in the seizure of S.G. at school, the panel concluded that *Ferguson* precluded a *T.L.O./Terry*-based analysis. (App. 21-25). That conclusion, however, conflicts with Supreme Court case law.

*Lidster* demonstrates that the panel's reliance on *Ferguson* was misplaced. Even if *Lidster* can be described as a "special needs" case, *see United States v. Kincaid*, 379 F.3d 813, 823 (9th Cir. 2004) (listing *Lidster* as

one of the "special needs" cases), it plainly falls outside the line of "special needs" cases the *Ferguson* Court said was inapplicable to governmental action having a law enforcement purpose. *See Kidd v. Ashcroft*, 580 F.3d 949, 969 (9th Cir. 2009) (so stating). *Lidster* clearly is an exception to *Ferguson*'s general rule that the "special needs" doctrine does not apply to governmental action having a law enforcement purpose. And the factor in *Lidster* that distinguishes it from the "special needs" cases referenced in *Ferguson*—*i.e.*, the target of the Fourth Amendment-related conduct in *Lidster* was a potential witness to a crime as opposed to a person suspected of wrongdoing—is present in this case. S.G. was the suspected victim of sexual abuse and, therefore, also a potential witness. That S.G.'s interview had a law enforcement purpose did not convert the encounter into one triggering the Fourth Amendment's warrant and probable cause requirements. *Lidster* makes that clear.

Based on that understanding of *Lidster* and *Ferguson*, the *Terry* balancing approach naturally applies here. Because the seizure at issue was of a potential witness, the court should conduct *Terry* balancing, which guided the decision in *Lidster*. And *T.L.O.*, in which the Court also conducted *Terry* balancing, provides additional guidance. More particularly, it provides the specific framework for determining the constitutionality of a government official's Fourth Amendment-related conduct in a *public school*. In short,

*T.L.O.* frames the balancing-of-interests analysis by identifying the student's reduced privacy and liberty interests as the interests against which the government's competing interests are weighed.

Contrary to what the panel concluded, the *T.L.O./Terry* analysis is not necessarily reserved exclusively for searches of students by school officials.[4] Although the *T.L.O.* Court made it clear that it was considering "only searches carried out by school authorities acting alone and on their own authority," 469 U.S. at 341 n. 1, nothing in its decision *prohibits* the application of *Terry*'s balancing approach to in-school seizures of students by non-school officials. Indeed, as noted, *T.L.O.*—by recognizing that students have reduced privacy and liberty interests while in a public school, and that the competing governmental interests must be balanced against those reduced interests— provides the framework for the balancing required in this case. Here, this court simply would balance the interests of social services caseworkers and police officers, rather than the interests of school officials, against the student's reduced privacy and liberty interests.

---

[4]    In addition to its conclusion that *T.L.O.* is rendered inapplicable by *Ferguson*, the panel concluded that certain language in *T.L.O.* limits the balancing approach employed in that case to searches by school officials.  (App. 18-21).

Accordingly, the panel should grant rehearing to reconsider its rejection of the *Terry* balancing approach and its application of the warrant/probable cause standard. Camreta and the deputy contacted S.G. in a safe and familiar environment to determine whether she was in danger and whether criminal charges should be pursued against her father. Balancing those weighty and legitimate governmental purposes against the relatively minimal intrusion posed by such an in-school encounter yields but one rational standard for assessing the constitutionality of the seizure: no Fourth Amendment violation occurs if the seizure is supported by a reasonable suspicion that the child is the victim of abuse and if the seizure is reasonable in scope.

### 3. This court should grant rehearing *en banc* to harmonize this decision with *Lidster*, *T.L.O.*, and *Ferguson*.

Interviews of suspected crime victims raise Fourth Amendment concerns that differ from the concerns raised by interviews of a criminal suspect. When a government official interviews a suspected child-abuse victim, two particularly significant public interests are advanced: protecting children from abuse and punishing the perpetrator of a particularly egregious crime. Those interests often coincide with the victim's – a situation that contrasts with the adversarial positions held by the state and a criminal suspect. Weighing those interests against the relatively minimal intrusion on a child's privacy and liberty interests associated with an in-school interview like that which occurred here, *Terry*'s

reasonable-suspicion/reasonable-in-scope standard is the appropriate Fourth Amendment standard. The district court correctly applied that standard.

The panel's application of the warrant and probable cause requirements goes beyond what any other federal circuit has held. None has concluded that those rigorous requirements apply to an *in-school* interview like the one at issue here. *Compare Calabretta v. Floyd*, 189 F.2d 808, 814-17 (9th Cir. 1999) (holding that warrant and probable cause requirements apply to child-abuse investigations involving entry into a home, and distinguishing public school setting). In short, as the panel recognized, this case presents an issue of exceptional importance. Further, the panel's decision conflicts with Supreme Court precedent. Therefore, an *en banc* panel should re-examine the panel's holding and resolve this case consistently with the Supreme Court's decisions in *Lidster*, *T.L.O.*, and *Ferguson*.

# CONCLUSION

For the foregoing reasons, panel rehearing or rehearing *en banc* is

warranted.

Respectfully submitted,

JOHN R. KROGER
Attorney General
JEROME LIDZ
Solicitor General


/s/  David B. Thompson

DAVID B. THOMPSON  #951246
Senior Assistant Attorney General

Attorneys for Defendant-Appellee
Bob Camreta

DBT:blt/1878950

# APPENDIX

# App.-1

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SARAH GREENE, personally and as
next friend for S.G., a minor, and
K.G., a minor,
                *Plaintiff-Appellant*

            v.

BOB CAMRETA; DESCHUTES COUNTY;
JAMES ALFORD, Deschutes County
Deputy Sheriff; BEND LAPINE
SCHOOL DISTRICT; TERRY FRIESEN,
                *Defendants-Appellees*

No. 06-35333

D.C. No.
CV-05-06047-AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
March 6, 2008—Portland, Oregon

Filed December 10, 2009

Before: Marsha S. Berzon and Carlos T. Bea, Circuit Judges,
and Philip Gutierrez,* District Judge.

Opinion by Judge Berzon

---

*The Honorable Philip Gutierrez, United States District Court for the
Central District of California, sitting by designation.

16291

# App.-2

## COUNSEL

Mikel R. Miller, Law Office of Mikel R. Miller, Bend, Oregon, for the plaintiff-appellant.

Hardy Myers, Attorney General; Mary H. Williams, Solicitor General; David B. Thompson, Senior Assistant Attorney General; for Bob Camreta, Defendant-Appellee. Janet M. Schroer, Hoffman, Hart & Wagner, LLP, for Terry Friesen and Bend LaPine School District, defendants-appellees. Christopher Bell and Mark P. Amberg, Deschutes County Legal Counsel,

**App.-3**

for Deputy Sheriff James Alford and Deschutes County, defendants-appellees.

---

## OPINION

BERZON, Circuit Judge:

We are asked to decide whether the actions of a child protective services caseworker and deputy sheriff, understandably concerned for the well-being of two young girls, exceeded the bounds of the constitution. Specifically, the girls' mother, Sarah Greene, alleges, on behalf of S.G., one of her children, that the caseworker, Bob Camreta, and deputy sheriff, James Alford, violated the Fourth Amendment when they seized and interrogated S.G. in a private office at her school for two hours without a warrant, probable cause, or parental consent. Sarah also argues that Camreta's subsequent actions, both in securing a court order removing the girls from her custody and in subjecting the girls to intrusive sexual abuse examinations outside her presence, violated the Greenes' familial rights under the Due Process Clause of the Fourteenth Amendment.

As this brief description makes clear, resolving the constitutional claims at issue in this case involves a delicate balancing of competing interests. On one hand, society has a compelling interest in protecting its most vulnerable members from abuse within their home. The number of child abuse allegations is staggering: In 2007, for example, state and local agencies investigated 3.2 million reports of child abuse or neglect. *See* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ADMINISTRATION ON CHILDREN, YOUTH AND FAMILIES. CHILD MALTREATMENT 2007 (2009), *available at* http://www.acf.hhs.gov/programs/cb/pubs/cm07/chapter2.htm.

# App.-4

On the other hand, parents have an exceedingly strong interest in directing the upbringing of their children, as well as in protecting both themselves and their children from the embarrassment and social stigmatization attached to child abuse investigations. Of the 3.6 million investigations conducted by state and local agencies in 2006, only about a quarter concluded that the children were indeed victims of abuse. *See id.* This discrepancy creates the risk that "in the name of saving children from the harm that their parents and guardians are thought to pose, states ultimately cause more harm to many more children than they ever help." Doriane Lambelet Coleman, *Storming the Castle to Save the Children: The Ironic Costs of a Child Welfare Exception to the Fourth Amendment*, 47 WM. & MARY L. REV. 413, 417 (2005).

With these competing considerations in mind, we turn first to Sarah's constitutional claims. As we explain below, we hold that the investigation conducted by Camreta and Alford and the removal and examination instigated by Camreta all violated Sarah and the girls' constitutional rights. As to the investigation, however, we conclude that Camreta and Alford cannot be liable in damages because they have qualified immunity.

## I.  FACTS & PROCEDURAL HISTORY

### A.  FACTUAL BACKGROUND

Nimrod Greene ("Nimrod") was arrested on February 12, 2003, for suspected sexual abuse of F.S., a seven-year old boy. Nimrod's arrest was based on statements made by F.S. to his parents and similar statements later made to investigators, all alleging that Nimrod had touched F.S.'s penis over his jeans when Nimrod was drunk in F.S.'s parents' home. F.S. reported that Nimrod had done this to him once before. In addition, F.S.'s mother told officers that Sarah, Nimrod's wife, "had talked to her about how she doesn't like the way Nimrod makes [their daughters, S.G. and K.G.,] sleep in his

# App.-5

bed when he is intoxicated and she doesn't like the way he acts when they are sitting on his lap." Along the same lines, F.S.'s father told officers that:

> Nimrod himself has made some type of prior comment about how his wife Sarah was accusing him of molesting his daughters and Sarah reportedly doesn't like the girls laying in bed with Nimrod when he has been drinking. [F.S.'s father] said neither he nor his wife [ ] have any direct knowledge of abuse at the Greene home, but this type of comment and/or accusation has come in several ways from Sarah and Nimrod.

The Oregon Department of Human Services ("DHS") heard of these allegations about a week after Nimrod's arrest. The next day, Bob Camreta, a caseworker with DHS, learned that Nimrod had been released and was having unsupervised contact with his daughters. Camreta was assigned to assess the girls' safety. Based on his training and experience as a DHS caseworker, Camreta was "aware that child sex offenders often act on impulse and often direct those impulses against their own children, among others. For this reason, [he was] concerned about the safety and well-being of Nimrod Greene's own small children."

Three days after hearing of Nimrod's release, Camreta visited S.G.'s elementary school to interview her. Camreta thought the school would be a good place for the interview because it is a place where children feel safe and would allow him "to conduct the interview away from the potential influence of suspects, including parents." According to Camreta, "[i]nterviews of this nature, on school premises, are a regular part of [child protective services] practice and are consistent with DHS rules and training." Sarah was not informed of, nor did she consent to, the interview of her daughter. Camreta also did not obtain a warrant or other court order before the interview.

# App.-6

Throughout the interview Camreta was accompanied by Deputy Sheriff Alford. Upon arriving at the school, Camreta told school officials that he and Alford were there to interview S.G. and requested use of a private office. Terry Friesen, a counselor at the elementary school, visited S.G. in her classroom and told the child that someone was there to talk with her. Friesen took S.G. to the room where Camreta and Alford were waiting and left.

Camreta interviewed S.G. for two hours in Alford's presence.[1] The interview was not recorded. Alford, who had a visible firearm, did not ask any questions during the interview. According to Camreta, S.G. told him:

- " 'When he drinks he tries to do it,' meaning, 'he tries to touch me somewhere in my private parts. Then I go to my room and lock the door.' "

- The last incident occurred " 'just last week' on the outside of her clothing and she had tried to tell him to stop."

- "The touching of private parts started when she was three."

- "The touching involved the chest and buttock areas, outside of clothing. Her father sometimes 'mumbled' during the touching."

- "Her mother knew about the touching . . ." and it was " 'one of our secrets' with her little sister, K.G.' "

---

[1] The parties dispute the length of the interview. Both Camreta and Alford assert that the interview lasted about an hour, while S.G. maintains that it lasted two hours. Because this is a motion for summary judgment, we view the facts in the light most favorable to the non-moving party and so assume that the interview lasted two hours.

# App.-7

Camreta maintains that he "certainly did not coerce [S.G.] or try to induce her into making any accusations."

In contrast, S.G. recounted the interview as follows:

> [Camreta] ask[ed] me if sometimes my dad touched me all over my body. I thought back to the times when my dad hugged me, kissed me, gave me piggy-back rides, rides on his shoulders and horsey rides. I remembered all of my dad's touches with fondness. He was a very loving father, and I loved hugging and kissing him. These were the touches that I was referring to when I said my dad touched me. So I told the man, yes, my dad touches me all over. And then the man started asking me if sometimes those were bad touches, and I said, no they weren't, but he kept asking me over and over again, and I would say, no, I don't think my dad touched me in a bad way. He would say, "No, that's not it," and then ask me the same question again. For over an hour, Bob Camreta kept asking me the same questions, just in different ways, trying to get me to change my answers. Finally, I just started saying yes to whatever he said. And then after a while, he said I could go. I believe I was there for two hours.

According to Sarah, later that night S.G. told her that when Camreta asked her what bad things her father had done, she initially told him "nothing," but that Camreta kept asking questions and confused her. S.G. stated that she was "scared" when Friesen left her with Camreta and Alford, although she did not ask to call home, did not ask to have Friesen or her parents with her, and did not cry. With respect to Alford's presence, S.G. stated that she is generally comfortable around police officers, that Alford was nice to her and did not do anything to scare her, and that she trusted him.

# App.-8

Based on the interview and other information he had gathered, Camreta believed that Nimrod had sexually abused S.G. As a result, Camreta and Alford visited the Greenes' home and spoke with Sarah and Nimrod. Both parents denied any sexual abuse but agreed to a safety plan whereby, pending an investigation, Nimrod would not have unsupervised contact with his two daughters, S.G. and K.G. The safety plan also provided that S.G. would undergo a sexual abuse examination at the KIDS Intervention & Diagnostic Service Center ("the KIDS Center"), which specializes in child sexual abuse. Camreta advised the parents not to speak with their children about the allegations of abuse.

On March 6, 2003, Nimrod was indicted on six counts of felony sexual assault of F.S. and S.G. He was shortly released but ordered not to have any contact with his daughters. That same day counsel for the Greenes informed Camreta that he had been retained to represent the family, that all family members had been advised of their Fifth Amendment right to remain silent and had chosen to invoke that right, and that no one from DHS had permission to meet with a member of the family without counsel present.

The next day, Camreta went to the Greene home to inform Sarah of the court's no-contact order and assess whether Sarah would comply with it. Sarah indicated that she had hired an attorney to defend her husband, that the allegations against him were lies, and that she had talked to S.G. about the allegations of abuse.

Sarah's and Camreta's accounts of the conversation between them on March 7 diverge in two respects. First, with regard to the no-contact order, Sarah stated that she told Camreta:

> [W]hile it would be significantly detrimental to [her] family finances, there was a place [her] husband could stay so that he would have no contact with

# App.-9

> [her] children. [She] specifically informed Mr. Cam-
> reta that [she] intended to abide by [the] Safety Plan
> and that [she] would take the children to the KIDS
> Center.

In contrast, Camreta maintains that Sarah told him "that she
had no extra resources for Nimrod to obtain alternative hous-
ing, which [Camreta] understood to mean [Nimrod] would be
returning home."

Second, Sarah stated she told Camreta that she "did want
[her] children interviewed at the KIDS Center" and "would
not interfere with them being interviewed," although she
"wished to attend [their] medical examination[s], to be there
to help them through the emotionally traumatic event." Cam-
reta maintains that "[Sarah] refused to sign an informational
release form to facilitate the pending sex abuse examination
of her daughter at the KIDS Center."

Following the March 7 conversation, Camreta was con-
cerned that DHS would not be able to ensure the safety of the
children because Sarah denied Nimrod's abuse and was
unwilling to place her children's interests over those of her
husband. Convinced that he had a duty to take protective
action, Camreta decided to seek an order removing both chil-
dren from Sarah's home.

On March 11, 2003, Camreta petitioned the Deschutes
County Juvenile Court for an order removing S.G. and K.G.
from the Greene home and placing them in foster care. In an
affidavit filed with the Juvenile Court, Camreta represented
that "[Sarah] indicated the family had no alternate resources
for either the children or Nimrod to ensure there would be no
contact," and that she "refused to sign an information release
form for a Kid's Center evaluation for the girls." Citing the
letter from the Greenes' counsel, Camreta stated that
"[w]ithout access to the family members[ ] and the home
DHS is unable to monitor and ensure the safety of the chil-

# App.-10

dren and unable to ensure that the children receive forensic interviews and exams to determine the health and welfare of S.G. and K.G., and to conclude the investigation."

After reviewing Camreta's petition and affidavit, the Juvenile Court issued a protective custody order authorizing the removal of S.G. and K.G. from the Greene home. DHS took protective custody of S.G. and K.G. the same day.

The next day, the Juvenile Court held an emergency shelter hearing, which both Sarah and Nimrod attended with counsel.[2] At the conclusion of the hearing, the Juvenile Court placed the children in DHS's temporary custody, scheduled KIDS Center assessments for both girls, ordered that the children be made available to participate in those assessments, prohibited Sarah from discussing the case with the children, ordered Nimrod not to have any contact with the children, and directed DHS to return the children to Sarah's care "as soon as [a] safety plan is in place and DHS concerns have been addressed."

DHS had custody of the children from March 11 through March 31, 2003. The two girls lived in a local foster home for those weeks. Sarah's contact with her daughters was limited to pre-arranged, supervised visits.

K.G. was interviewed and examined at the KIDS Center on March 20, 2003, and S.G. was interviewed and examined on March 31, 2003. On the day of K.G.'s examination, Sarah

---

[2]The district court characterized the shelter hearing as "an opportunity [for Sarah], with counsel, . . . to challenge the evidence presented in support of the court order." The record, however, contains virtually no information about the shelter hearing, other than the facts that both parents attended with counsel, that counsel was appointed for the children, and that the hearing took one hour and fifteen minutes. The record does not indicate whether the Greenes presented evidence at the emergency shelter hearing to rebut Camreta's assertion that Nimrod was unable to comply with the no-contact order.

# App.-11

went to the KIDS Center "fully intend[ing] to cooperate with the KIDS Center and lend whatever assistance and support [she] could to [her] daughter." According to her affidavit, however, she was prevented from doing so when KIDS Center staff, acting "under orders of Bob Camreta," forced her "to leave the premises." Sarah was also excluded from the premises during S.G.'s examination.

At her KIDS Center interview, S.G. said that her earlier statements to Camreta concerning Nimrod were not true and that he had not abused her. During the examination, S.G. was told to undress, and the examiners "looked all over [her] body," "took pictures of [her] private parts," and used a magnifying glass scope to visually examine her. In her deposition, S.G. stated that a doctor asked her to let her know if she felt uncomfortable and told her that the examination would stop if she felt uncomfortable, but that she never told the doctor she felt uncomfortable or asked to stop the interview. She also testified that she felt fine after the examination was over and did not feel sick or upset. In her affidavit, however, S.G. stated, "I wish my mom could have been there. I felt very scared and alone . . . . [T]hey looked all over my body, and it was very uncomfortable."

Ultimately, the KIDS Center examiners could not determine whether S.G. and K.G. had been sexually abused. Even so, they "remained concerned for [S.G.] especially as there appears to be a high likelihood that S.G. may have recanted her statements about her father touching her privates in an attempt to expedite her return home." Despite these concerns, the Juvenile Court, at DHS's request, ordered the children returned to their mother's custody on March 31, 2003.

Nimrod eventually stood trial on charges of sexual abuse but the jury did not reach a verdict. Faced with a retrial, Nim-

# App.-12

rod accepted an *Alford* plea with respect to the alleged abuse of F.S.[3] The charges concerning S.G. were dismissed.

## B. PROCEDURAL HISTORY

Sarah filed this action on behalf of herself, S.G., and K.G. under 42 U.S.C. § 1983, alleging that: (1) Camreta and Alford's in-school seizure of S.G. without a warrant, parental consent, probable cause, or exigent circumstances violated the Fourth Amendment; (2) Camreta violated the Greenes' rights under the Fourteenth Amendment by intentionally presenting false information to the Juvenile Court to obtain an order to remove the children from Sarah's custody and by removing the children from Sarah's care; and (3) Camreta and the KIDS Center violated the Greenes' Fourteenth Amendment rights by unreasonably interfering with Sarah's right to be with her children and with the children's right to have their mother present during an intrusive medical examination.[4]

The district court granted summary judgment to all defen-

---

[3]A defendant who enters an *Alford* plea maintains his innocence but admits that sufficient evidence exists from which a judge or jury could find him guilty. *See North Carolina v. Alford*, 400 U.S. 25 (1970).

[4]There were other defendants, claims, and requests for relief in the Greenes' complaint, not pertinent to this appeal.

In particular, the complaint alleged custom and policy claims against Bend LaPine School District and Deschutes County with regard to the seizure of S.G. The district court rejected those claims, and the Greenes' opening brief does not challenge that holding. Any challenge to the dismissal of the claims against the School District and the County has therefore been waived, and the dismissal stands. *See Ind. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

The Greenes also brought a claim against Friesen, the school guidance counselor, for her role in removing S.G. from class to conduct the interview. Friesen was sued only in her official capacity. Claims against Friesen in her official capacity are treated as if they had been brought directly against the school district, *see Butler v. Elle*, 281 F.3d 1014, 1026 n.9 (9th Cir. 2002), so the dismissal of the suit against Friesen also stands.

# App.-13

dants. As to the in-school interrogation, the court held that S.G. had been seized when she was taken from her classroom and interviewed by Camreta and Alford but that the seizure was "objectively reasonable under the facts and circumstances of this case." Moreover, even if the Greenes' constitutional rights had been violated, the district court held, Camreta and Alford were entitled to qualified immunity because "no reasonable school official, caseworker, or police officer would have believed [their] actions violated the Fourth Amendment."

With respect to the removal of S.G. and K.G. from Sarah's custody and Sarah's exclusion from their medical examinations, the court held that there were no due process violations because the girls were removed from Sarah's custody pursuant to a court order and Sarah was given an opportunity to be heard at the custody hearing. The court also concluded that (1) Camreta was, in any event, entitled to absolute quasi-judicial immunity regarding the removal of the girls; and (2) excluding Sarah from the examinations did not violate the Fourteenth Amendment because Sarah did not have custody at that time and the examinations conformed with Oregon statutory and administrative law.

The Greenes timely appealed.

## II. ANALYSIS

As this case is an appeal from the grant of summary judgment to defendants, we will draw all reasonable inferences in the Greenes' favor. Defendants, as the moving parties, bear the burden of production and persuasion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). We review the grant of summary judgment *de novo. See Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007).

### A. SCHOOL INTERVIEW

Before proceeding to the merits of the school interview issue, a note on our reasons for addressing this central consti-

# App.-14

tutional claim on the merits is in order. Ultimately, the question in this case is whether the individual defendants may be held liable in damages to the Greenes. The defendants maintain that even if they violated the Greenes' constitutional rights, they are entitled to qualified immunity and so not liable in damages.

[1] Before the Supreme Court's recent decision in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), courts addressing an official's claim of qualified immunity were required to follow the two-step sequential inquiry established in *Saucier v. Katz*, 533 U.S. 194 (2001), asking first whether the plaintiff alleged violation of a constitutional right and, second, whether that right was clearly established at the time of the conduct at issue. *Pearson* relieved courts of their obligation always to follow this sequence, permitting "[t]he judges of the district courts and the courts of appeal . . . to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

[2] Although rigid adherence to the *Saucier* protocol is no longer required, *Pearson* was also careful to note that the *Saucier*'s two-step procedure is "often beneficial," as it "promotes the development of constitutional precedent." *Id.* Such is the case here, where the constitutional standards governing the in-school seizure of a student who may have been abused by her parents are of great importance. As will appear, although other circuits have provided guidance to parents, school officials, social workers, and law enforcement personnel on the issue, we have not. In a similar circumstance arising after *Pearson*, we addressed the constitutional issue on the merits first. *See Stoot v. City of Everett*, 582 F.3d 910, 918 n.8 (9th Cir. 2009) (conducting the constitutional inquiry "where we have not previously addressed whether a police officer may rely solely on the statements of a very young victim of alleged sexual abuse to establish probable cause to seize a potential suspect.") (emphasis altered). *See also Kelsey v.*

# App.-15

*Country of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) ("The development of constitutional precedent is especially important here, where . . . this Court has not spoken on . . . the constitutionality of clothing exchange procedures in jails."); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 430 n.9 (2d Cir. 2009) (finding it "necessary to articulate the nature of the claimed violation" before determining whether the right in question was clearly established).

[3] Moreover, the school interview issue does not present a "kaleidoscopic set of facts . . . creat[ing] . . . a classic genuine issue of material fact on the central issue" on which the alleged constitutional violation turns, rendering a constitutional determination too case-specific to aid in clarifying the law for the future. *Mueller v. Auker*, 576 F.3d 979, 994 (9th Cir. 2009). To the contrary, we consider the relatively straightforward question whether an in-school seizure and interrogation of a suspected child abuse victim is always permissible under the Fourth Amendment without probable cause and a warrant or the equivalent of a warrant,[5] as defendants maintain. We therefore address both prongs of the qualified immunity inquiry in this case, to provide guidance to those charged with the difficult task of protecting child welfare within the confines of the Fourth Amendment.

[4] With that background, we proceed to consider whether, as the Greenes argue, the warrantless, in-school interview of S.G. violated S.G.'s Fourth Amendment rights.[6] The Fourth Amendment guarantees individuals the right "to be secure in their persons . . . against unreasonable searches and seizures

---

[5]As discussed *infra*, Part II.A.2, we hold that in the child abuse investigation context, a court order permitting the seizure of a child is the functional equivalent of a warrant.

[6]The Greenes have not argued that the in-school seizure of S.G. violated Sarah's familial rights under the Fourteenth Amendment, although they have made such a claim with respect to the subsequent removal order and physical examinations. *See Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982).

# App.-16

. . ." by government officials. U.S. CONST. amend. IV. Camreta and Alford do not contest the district court's holding that the two-hour interview of S.G. at her school was a seizure. We agree with the district court, and with the ruling of the Seventh Circuit in a very similar case, that it was. *See Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) (holding that student removed from class to be questioned by a caseworker and a uniformed police officer regarding alleged abuse had been seized for Fourth Amendment purposes); *id.* at 510 n.15 (collecting similar cases). The question before us is whether that seizure was "unreasonable."

[5] We have yet to address the principles governing the in-school seizure of a suspected child abuse victim. We have, however, previously held that the warrantless, non-emergency search and seizure of an alleged victim of child sexual abuse at her home violates the Fourth Amendment. *See Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999). *Calabretta* does not resolve the Fourth Amendment issue in this case but goes a fair way towards doing so.

In *Calabretta*, a social worker received a tip from a neighbor who claimed to have been awakened late at night by a child screaming "No Daddy, no." *Id.* at 810. Suspecting abuse, the social worker, accompanied by a police officer, visited the home, entered without consent, and interviewed and examined the children. *Id.* at 810-12. The family later brought suit, alleging violation of their Fourth Amendment rights.

[6] The defendants in *Calabretta* maintained, primarily, that the search and seizure at the family home was reasonable because "any check on the welfare of children" triggered the "exigent circumstance[s]" exception to the Fourth Amendment's warrant requirement. *Id.* at 811. They also came at the problem another way, arguing that traditional Fourth Amendment protections do not apply to child abuse investigations at all, as such investigations constitute administrative searches requiring neither probable cause nor a warrant. *Id.* at 812. We

# App.-17

rejected both arguments, holding both that traditional Fourth Amendment protections apply to child abuse investigations and that the family's right to be free of warrantless searches and seizures in their home, even within the context of a child abuse investigation, was clearly established at the time of the incident. *See id.* at 817. We have reaffirmed our holding in *Calabretta* twice, noting that although the crime of child sexual abuse "may be heinous . . . [this] does not provide cause for the state to ignore the rights of the accused or any other parties." *Wallis v. Spencer,* 202 F.3d 1126, 1130 (9th Cir. 2000); *see also Rogers v. County of San Joaquin,* 487 F.3d 1288, 1291 (9th Cir. 2007).

Defendants insist that *Calabretta* and *Wallis* have nothing to do with this case because S.G. was seized at school rather than at home. Citing the Supreme Court's decision in *New Jersey v. T.L.O.,* defendants argue that searches and seizures[7] in public schools are subject to a special standard of reasonableness, whereby a search or seizure is "reasonable" if it was "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." 469 U.S. 325, 341 (1985), quoting *Terry v. Ohio,* 392 U.S. 1, 20 (1967). Defendants urge us to conclude, in other words, that while seizing S.G. and interviewing her at home for two hours would have been unreasonable absent probable cause and a warrant or exigent circumstances, it was reasonable to do a similarly lengthy interrogation in the same way

---

[7]Although *T.L.O.,* like many of the so-called "special needs" cases listed *infra* note 9, involved a search rather than a seizure, courts have applied the same standard to seizures of students at public schools as to searches. *See Jones v. Hunt,* 410 F.3d 1221, 1228 (10th Cir. 2005) (citing *Edwards v. Rees,* 883 F.2d 882, 844 (10th Cir. 1989)); *Wofford v. Evans,* 390 F.3d 318, 326 (4th Cir. 2004); *Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075, 1079 (5th Cir. 1995). Indeed, the standard enunciated in *T.L.O.* was based on the "reasonableness" standard established in *Terry v. Ohio,* 392 U.S. 1, 20 (1968), which involved a brief seizure for investigative purposes. We therefore draw on Fourth Amendment case law governing both searches and seizures throughout this opinion.

# App.-18

at S.G.'s school. We decline to adopt this distinction, for reasons we now explain.

### 1. *T.L.O.* and the Fourth Amendment in Public Schools

We begin by noting that, despite defendants' heavy reliance upon it, the Supreme Court's decision in *T.L.O.* is at best tangentially related to this case. *T.L.O.* addressed the claims of a high school student whose purse was searched by an assistant vice principal, without a warrant or probable cause, after a teacher discovered two girls smoking in the school lavatory. 469 U.S. at 328. The Court held the search reasonable even in the absence of a warrant or probable cause, explaining that the warrant requirement was "unsuited to the school environment" because it "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *Id.* at 340. The Court similarly noted that the school setting required "some modification of the level of suspicion" needed to justify a search of students, in light of "the substantial need of teachers and administrators for freedom to maintain order in the schools." *Id.* at 340-41. The Court therefore applied a special standard — "reasonableness under all the circumstances" — which "involves a twofold inquiry: first, . . . whether the action was justified at its inception; second, . . . whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341 (internal citation and quotation omitted).

Defendants maintain that we must apply this standard across-the-board to all searches and seizures in public schools, but the language of *T.L.O.* itself indicates that it was not meant to be read so broadly. The Court expressly noted, for example, that it was addressing only searches "by a teacher or other school official," explaining that "[b]y focusing attention on the question of reasonableness, the standard will spare teachers and administrators the necessity of school-

# App.-19

ing themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense." *Id.* at 341, 343. The Court further clarified that it was considering "only searches carried out by school authorities acting alone and on their own authority," expressing "no opinion" on "the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies." *Id.* at 341 n.7.

[7] The Court recently affirmed the narrowness of *T.L.O.*, characterizing it as "h[o]ld[ing] that for searches by school officials a careful balancing of governmental and private interests" requires a showing less than probable cause, and therefore applying "a standard of reasonable suspicion to determine the legality of a school administrator's search of a student." *Safford Unified Sch. Dist. v. Redding*, 129 S.Ct. 2633, 2639 (2009) (internal citation and quotation omitted).[8] *See also Ferguson v. City of Charleston*, 532 U.S. 67, 79 n.15 (2001) (noting that "[i]n *T.L.O.*, [the Court] made a point of distinguishing searches 'carried out by school authorities acting alone and on their own authority' from those conducted 'in conjunction with, or at the behest of law enforcement agencies' ").

[8] S.G. was, of course, seized and interrogated by a social services caseworker and a deputy sheriff. Neither of these individuals qualifies as a "school official." Thus, by its own terms, *T.L.O.* does not control our resolution of S.G.'s Fourth Amendment claim. The Second Circuit has reached the same conclusion we do, holding *T.L.O.* inapplicable to the seizure of a student by a social services agency caseworker. *See Tenenbaum v. Williams*, 193 F.3d 581, 607 (2d Cir. 1999). As the Second Circuit explained, "[p]ublic schools have a relationship with their students that is markedly different from the

---

[8]*Redding* held that a strip search of a girl suspected of possessing prescription ibuprofen was unreasonable under the *T.L.O.* standard.

# App.-20

relationship between most governmental agencies, including [Child Protective Services], and the children with whom they deal. Constitutional claims based on searches or seizures by public school officials relating to public school students therefore call for an analysis . . . that is different from that [for searches or seizures by caseworkers]." *Id.*

Moreover, the Court's decision in *T.L.O.* was premised on a "special need" of government not present in this case: "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." 469 U.S. at 339. The Court noted that disciplinary problems and student drug use had been rising in recent years, and that "the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *Id.* It was in light of these considerations that the Court concluded that the school's need swiftly to discipline T.L.O., suspected of smoking in the lavatory in violation of school rules, would be frustrated if school officials were required first to obtain a warrant based on probable cause. *Id.* at 340-41.

In this case, by contrast, S.G. is not suspected of having violated any school rule, nor is there any evidence that her immediate seizure was necessary to "maintain[ ] discipline in the classroom and on school grounds." *Id.* at 339. The "special need" animating the Court's decision in *T.L.O.* is therefore entirely absent.[9] *See Jones v. Hunt,* 410 F.3d 1221, 1228

---

[9]For the same reason, several of the other school seizure cases relied upon by defendants are inapposite, as they also address situations in which the student was suspected of committing an infraction on school grounds or during a school activity. *See, e.g., Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295 (11th Cir. 2006) (student verbally threatened teacher); *Wofford v. Evans,* 390 F.3d 318 (4th Cir. 2004) (student allegedly brought gun to school); *Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075 (5th Cir. 1995) (student detained and removed from school field trip due to misbe-

# App.-21

(10th Cir. 2005) (holding the *T.L.O.* standard inapplicable to the seizure of a student that did "not involve efforts by school administrators to preserve order on school property").

[9] These distinctions are crucial if we are properly to assess the Fourth Amendment standard applicable to the seizure of an alleged victim of child sexual abuse at her school. "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." *T.L.O.*, 469 U.S. at 337. For each "specific class of searches," we determine the appropriate standard of reasonableness by " 'balancing the need to search against the invasion which the search entails.' " *Id.* (quoting *Camara v. Mun. Court*, 387 U.S. 523, 536-37 (1967)). If the seizure of a student at school to investigate sexual abuse by a parent could be said to belong to the same "specific class of searches" as the search of a student's purse to investigate a disciplinary infraction, we would be justified in applying the reasonableness standard outlined in *T.L.O.* to the facts of this case. But *T.L.O.* itself indicates that the two types of searches differ in critical ways. We therefore cannot rely on the balancing of interests in *T.L.O.* to assess the reasonableness of defendants' decision to seize S.G.

## 2. The "Special Needs" Doctrine & Child Sexual Abuse Investigations

[10] Defendants also argue that, even if the Supreme Court's decision in *T.L.O.* does not strictly control this case, *T.L.O.* stands more generally for the proposition that probable

---

havior); *Edwards v. Rees*, 883 F.2d 882 (10th Cir. 1989) (student suspected of making a bomb threat); *Cason v. Cook*, 810 F.2d 188 (8th Cir. 1987) (student suspected of breaking into another student's locker); *Tarter v. Raybuck*, 742 F.2d 977 (6th Cir. 1984) (student suspected of dealing drugs at school).

# App.-22

16318        GREENE V. CAMRETA

cause and a warrant are not "irreducible requirement[s] of a valid search" or seizure under the Fourth Amendment. *See T.L.O.*, 469 U.S. at 340. That much is quite true. *T.L.O.* belongs to a line of cases in which the Supreme Court has lowered traditional Fourth Amendment protections "when special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable."[10] *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation omitted). Although defendants acknowledge that neither the Supreme Court nor this court has applied the "special needs" doctrine to searches or seizures of children during a child abuse investigation, they argue that the government's "special need" to protect children from sexual abuse justifies a departure from both the warrant and probable cause requirements in a case such as this one.[11] As noted above, we

---

[10]Although the term "special needs" was first used by Justice Blackmun in his concurring opinion in *T.L.O.*, *see* 469 U.S. at 351 (Blackmun, J., concurring), the doctrine is rooted in the Supreme Court's decision in *Camara v. Mun. Court*, 387 U.S. 523 (1967), which addressed the constitutionality of San Francisco's warrantless building inspection program. Since *Camara*, the Court has applied the doctrine in a number of contexts in which such "special needs" exist. *See, e.g., Bd. of Educ. v. Earls*, 536 U.S. 822 (2002) (drug testing of high school students participating in extracurricular activities); *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995) (random drug testing of high-school athletes); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) (drug and alcohol testing of railroad employees involved in accidents); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) (drug testing of employees applying for certain Customs Service positions); *Griffin v. Wisconsin*, 483 U.S. 868 (1987) (search of probationers); *New York v. Burger*, 482 U.S. 691 (1987) (administrative inspections in closely-regulated industries); *O'Connor v. Ortega*, 480 U.S. 709 (1987) (workplace searches of public employees); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (traffic stops at border checkpoints). *But see Ferguson*, 532 U.S. at 84-85 (refusing to extend special needs doctrine to drug testing of pregnant women for law enforcement purposes); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (refusing to extend doctrine to police roadblocks aimed at detecting narcotics trafficking); *Chandler v. Miller*, 520 U.S. 305 (1997) (refusing to extend doctrine to drug testing of candidates for political office).

[11]The federal district and circuit courts are split on the applicability of the "special needs" doctrine to investigations of child abuse. *Compare Roe*

# App.-23

addressed a similar argument in *Calabretta*, holding that traditional Fourth Amendment protections apply to the seizure of a child from her home. We reach the same conclusion in this case, as we now explain.

[11] The threshold inquiry in a "special needs" case is whether the government has identified some need, "beyond the normal need for law enforcement," to justify a departure from traditional Fourth Amendment standards. *Von Raab*, 489 U.S. at 665-66; *see also Ferguson*, 532 U.S. at 74 n.7; *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1056 (9th Cir. 2002). So, although the Supreme Court has "tolerated suspension of the Fourth Amendment's warrant or probable-cause requirement[s] [when] there was no law enforcement purpose behind the searches . . ., and . . . little, if any, entanglement with law enforcement" in conducting them, *Ferguson*, 532

---

*v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 406-07 (5th Cir. 2002) (holding the "special needs" doctrine inapplicable given the extensive involvement of law enforcement in investigations of child abuse under Texas law); *Tenenbaum*, 193 F.3d at 606 (applying traditional Fourth Amendment analysis to searches and seizures made in the course of child abuse investigations); *Franz v. Lytle*, 997 F.2d 784, 791 (10th Cir. 1993) (holding "special needs" doctrine inapplicable to investigation of child abuse conducted by law enforcement); *Good v. Dauphin County Soc. Servs.*, 891 F.2d 1087, 1093-94 (3d Cir. 1989) (applying traditional Fourth Amendment analysis); *with Doe v. Bagan*, 41 F.3d 571, 575 n.3 (10th Cir. 1994) (applying *T.L.O.*'s lesser standard of reasonableness to the seizure of a student during a child sexual abuse investigation); *Wildauer v. Frederick County*, 993 F.2d 369, 372-73 (4th Cir. 1993) (same); *Darryl H. v. Coler*, 801 F.2d 893, 900-02 (7th Cir. 1986) (applying *T.L.O.*'s lesser standard of "reasonableness" and holding the warrant and probable cause requirements inapplicable). In the Seventh Circuit, the appropriate standard of review under the Fourth Amendment turns on whether the student attends private or public school. *Compare Michael C. v. Gresbach*, 526 F.3d 1008, 1015 (7th Cir. 2008) (holding that caseworkers must comply with the warrant and probable cause requirements when searching and seizing students on private school grounds); *Doe v. Heck*, 327 F.3d 492, 512 (7th Cir. 2003) (same); *with Darryl H.*, 801 F.2d at 900-02 (applying lesser standard of reasonableness to the same conduct on public school grounds).

# App.-24

U.S. at 79 n.15, the Court hasn't relaxed traditional Fourth Amendment protections when the main purpose of an ostensibly administrative search was to gather evidence for use in subsequent criminal proceedings, or when law enforcement personnel were substantially involved in the design and implementation of the administrative program. Indeed, "[n]one of [the Court's] special needs cases have . . . upheld the collection of evidence for criminal law enforcement purposes." *Id.* at 83 n.20; *see also Edmond*, 531 U.S. at 38. Rather, "[t]he traditional . . . requirements are waived . . . on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes." *Ferguson*, 532 U.S. at 88 (Kennedy, J., concurring).

[12] In this case, the presence of law enforcement objectives is evident. At the time of the seizure, police were actively investigating allegations of child sexual abuse against S.G.'s father and a police officer was present at S.G.'s interview. As courts faced with similar "dual-purpose" searches have noted, "disentangling [the goal of protecting a child's welfare] from general law enforcement purposes" becomes particularly "difficult" in these circumstances, as we cannot allow "[o]ther societal objectives [to] justify a program that would systematically collect information for the police." *Roe*, 299 F.3d at 406-07; *see also Ferguson*, 532 U.S. at 83 n.20; *Edmond*, 531 U.S. at 38, 41-42. Here, we are convinced that law enforcement personnel and purposes were too deeply involved in the seizure of S.G. to justify applying the "special needs" doctrine, for two primary reasons.[12]

[13] First, police were conducting an ongoing investigation of S.G.'s father, and Camreta requested that Deputy Sheriff Alford, a uniformed police officer carrying a visible firearm,

---

[12]The facts of this case do not require us to decide whether the "special needs" doctrine would apply to an in-school interrogation of a child where there is no direct law enforcement purpose and no involvement of law enforcement personnel.

# App.-25

accompany him to the interview. A state regulation required Child Protective Service workers to "[i]nterview the child out of the presence of other persons, unless the CPS worker believes the presence of a school employee or other person would facilitate the interview." OR. ADMIN. R. 413-015-0610(4) (2003).[13] There are two apparent ways in which Alford's presence might have "facilitated" the interview. One purpose may have been to gather evidence firsthand, which would clearly run afoul of the Supreme Court's admonition that "[n]one of [its] special needs cases have . . . upheld the collection of evidence for criminal law enforcement purposes." *Ferguson*, 532 U.S. at 83 n.20; *see also Franz*, 997 F.2d at 791. Or perhaps Camreta and Alford believed that "the threat of law enforcement intervention" would provide the "necessary leverage" to "facilitate" Camreta's interview with S.G., reasoning that a nine-year-old girl would surely feel compelled to talk truthfully in the presence of a uniformed, armed police officer. *Cf. Ferguson*, 532 U.S. at 72. Either way, the decision to have Alford accompany Camreta to the interview constituted sufficient entanglement with law enforcement to trigger the traditional Fourth Amendment prerequisites to seizure of a person.

[14] Second, we are mindful of the general rule that the constitutionality of a search or seizure cannot turn on the subjective intent of government officials. *See Whren v. United States*, 517 U.S. 806, 813 (1996). But the Supreme Court has allowed a "purpose inquiry in [the 'special needs'] context [if] conducted only at the programmatic level," cautioning that such an inquiry "is not an invitation to probe the minds of individual officers acting at the scene." *Edmond*, 531 U.S. at 48. We therefore look to Oregon law to determine whether "a child protective services search is so intimately intertwined with law enforcement" as to render the "special needs" doc-

---

[13]The regulations cited are those in effect at the time of the events in this case. There have been some changes since. *See* OR. ADMIN. R. 413-015-0415(5) (2009).

# App.-26

trine inapplicable. *Roe*, 299 F.3d at 407. Our review of Oregon's statutory scheme convinces us that the involvement of law enforcement in this case is symptomatic of the broader entanglement of law enforcement and social services officials in the state's investigation of child abuse.

Under Oregon law, an investigation into alleged abuse begins when a mandatory reporter[14] contacts either "the local office of the Department of Human Services" or "a law enforcement agency within the county." OR. REV. STAT. § 419B.015.[15] Once a report is received, the Department must notify a law enforcement agency, and vice versa. *Id.* Reports are then accorded priority based upon criteria, established by the department, that "enable[s] the department, the designee of the department or a law enforcement agency to quickly and easily identify reports that require notification within 24 hours after receipt." § 419B.017. Either "the department or the agency shall immediately cause an investigation to be made to determine the nature and cause of the abuse of the child." § 419B.020(1). "If the law enforcement agency conducting the investigation finds reasonable cause to believe that abuse has occurred, the law enforcement agency shall notify . . . the local office of the department," which "shall provide protective social services of its own or of other available social agencies to prevent further abuses." § 419B.020(3).

Either the law enforcement agency or the department may also take protective custody of the child. § 419B.020(5)(a). If either an officer or a caseworker "has reasonable cause to

---

[14]A "mandatory reporter" is "[a]ny public or private official having reasonable cause to believe that any child with whom the official comes in contact has suffered abuse or that any person with whom the official comes in contact has abused a child." See OR. REV. STAT. § 419B.010. With certain exceptions, any official with such knowledge "shall immediately report or cause a report to be made" to DHS or local law enforcement. *Id.*

[15]All the remaining citations in this paragraph are also to Oregon Revised Statutes.

# App.-27

believe that the child has been affected by sexual abuse . . . and that physical evidence of the abuse exists and is likely to disappear, the court may authorize a physical examination for the purposes of preserving evidence . . ." § 419B.020(6). Moreover, any "person conducting an investigation" under the statute who "observes a child who has suffered suspicious physical injury . . . shall [i]mmediately photograph or cause to have photographed the suspicious physical injuries . . . and [e]nsure that a designated medical professional conducts a medical assessment within 48 hours . . ." §§ 419B.023, 419B.028. Once photographs are taken, the officer or caseworker "shall . . . place hard copies or prints of the photographs . . . in any relevant files pertaining to the child maintained by the law enforcement agency or the department." § 419B.028(2)(b).

[15] The Fifth Circuit, reviewing similar provisions for investigating child abuse under Texas law, held that such joint investigations were not "divorced from the state's general interest in law enforcement," because they functioned "as a tool both for gathering evidence for criminal convictions and for protecting the welfare of the child." *Roe*, 299 F.3d at 406-07 (quotation omitted). We reach the same conclusion here. Oregon's statutory scheme makes no effort to distinguish between criminal investigations of child abuse and civil investigations to protect the victims of abuse. To the contrary, the provisions described above encourage entanglement between law enforcement and social service workers, by involving both police officers and caseworkers in the gathering and collection of evidence of child sexual abuse from the outset of an investigation.

[16] We do not mean to express any negative judgment concerning the wisdom of Oregon's policy. It may well be that fostering coordination and collaboration between caseworkers and law enforcement officers is an effective way both to protect children and to arrest and prosecute child abusers — each, of course, governmental activity of the highest

# App.-28

importance. But we do hold that state officials using such a policy cannot thereby forge an exception to traditional Fourth Amendment protections for the criminal investigation of child sexual abuse, as they seek to do here. Again, "[t]he fact that the suspected crime may be heinous . . . does not provide cause for the state to ignore the rights of the accused or any other parties." *Wallis*, 202 F.3d at 1130.

This is not to say, of course, that the seizure of S.G. was unconstitutional "simply because, in the course of [investigating], an inspecting officer may discover evidence of crimes." *Burger*, 482 U.S. at 716. Any time a government official suspects that a child has been abused, investigation of that abuse for child protection purposes may uncover evidence of a crime. Nor do we suggest that a caseworker conducting an investigation to ensure the welfare of the child is precluded from sharing the fruits of that investigation with law enforcement officers, who may subsequently use such information to prosecute the offender. *See Ferguson*, 532 U.S. at 80-81, 85; *id.* at 90 (Kennedy, J., concurring).[16]

[17] Rather, we hold, as we did in *Calabretta*, that "the general law of search warrants applie[s] to child abuse inves-

---

[16]Mandatory reporting laws, which require public and private officials to contact the authorities if they have reasonable grounds to suspect that a child is being abused, *see, e.g.*, OR. REV. STAT. § 419B.010, do not raise the constitutional concerns discussed in the text. As the Supreme Court carefully noted in Ferguson, mandatory reporters come across such information in the course of their normal business and do not intend to elicit or coerce such statements. *See* 532 U.S. at 78 n.13, 80-81; *id.* at 90 (Kennedy, J., concurring). Nothing in our opinion today would prevent a teacher, for example, from discussing suspected abuse with a student or from passing along any such information to social service workers. For "[w]hen a parent sends her child to school, she delegates some of her parenting responsibilities to school officials. Though she does not consent to overzealous investigators interrogating her children over the principal's objection . . ., she should reasonably expect that school officials will speak with her child if the child raises serious concerns about her home life." *United States v. Hollingsworth*, 495 F.3d 795, 802 (7th Cir. 2007).

# App.-29

tigations." *Calabretta*, 189 F.3d at 814. Once the police have initiated a criminal investigation into alleged abuse in the home, responsible officials must provide procedural protections appropriate to the criminal context. At least where there is, as here, direct involvement of law enforcement in an in-school seizure and interrogation of a suspected child abuse victim, we simply cannot say, as a matter of law, that she was seized for some "special need[ ], beyond the normal need for law enforcement." *Ferguson*, 532 U.S. at 74 n.7.

[18] In short, applying the traditional Fourth Amendment requirements, the decision to seize and interrogate S.G. in the absence of a warrant, a court order, exigent circumstances,[17] or parental consent[18] was unconstitutional. We follow the lead of our sister circuits and hold that in the context of the seizure of a child pursuant to a child abuse investigation, a court order permitting the seizure of the child is the equivalent of a warrant.[19]

---

[17]Exigent circumstances permit a caseworker to seize a child without a warrant if the caseworker has "reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Rogers*, 487 F.3d at 1294; *see also Burke v. County of Alameda*, 2009 WL 3739333 at *4-5 (9th Cir. 2009) (holding that a child's statements during an interview gave the officer reasonable cause to believe that she was in danger of imminent sexual and physical abuse); *Tenenbaum*, 193 F.3d at 594. The exigent circumstances exception is not applicable here. Defendants waited three days to detain and interrogate S.G. after receiving the initial report from DHS, and then returned her to her parents' custody after the allegedly incriminating interview. Such delays and actions undermine any claimed exigency. *See Rogers*, 487 F.3d at 1296; *Tenenbaum*, 193 F.3d at 595, 605.

[18]S.G.'s parents did not consent to her seizure at school, as defendants did not notify them of the planned interview. The fact that defendants received permission from school officials to conduct the interview does not constitute valid "consent." "The handing over of a child from a public school teacher to another State official . . . is not the equivalent of the consent of the parents." *Tenenbaum*, 193 F.3d at 594 n.9; *see also T.L.O.*, 469 U.S. at 336 (recognizing the limits of the *in loco parentis* doctrine in this context).

[19]Here, for instance, Or. Rev. Stat. § 419B.045 specifically authorizes caseworkers to investigate reports of child abuse on public school prem-

# App.-30

*See, e.g., Tenenbaum,* 193 F.3d at 602; *Doe v. Heck,* 327 F.3d at 517; *Gates v. Texas Dept. of Protective and Regulatory Servs.,* 537 F.3d 404, 429 (5th Cir. 2008). We therefore reverse the district court to the extent that it held that Alford and Camreta had not violated S.G.'s right to be free from an unconstitutional seizure.

## B. QUALIFIED IMMUNITY

[19] Even where, as here, government officials have violated citizens' constitutional rights, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson,* 129 S. Ct. at 815 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "[Our] inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' " *Id.* at 822 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)); *see also Anderson v. Creighton,* 483 U.S. 635, 640 (1987). If a government official "could . . . have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right," he is entitled to qualified immunity. *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001).

[20] The Greenes bear the burden of demonstrating that the right allegedly violated was clearly established at the time of the incident. *See Galen v. County of Los Angeles,* 477 F.3d

---

ises. Section 419B.150 permits an employee of the Department of Human Services or other officer to take a child into protective custody upon an order by the juvenile court. As the statutory scheme thus permits a caseworker to seek a court order for temporary protective custody and permits in-school interviews, it appears that a caseworker could obtain a court order for an in-school interview that complies with the constitution by presenting facts, "supported by Oath or affirmation," to a judge, which facts constitute probable cause to suspect the child has been abused.

# App.-31

652, 665 (9th Cir. 2007). To meet this burden, the Greenes cite only two cases: our prior decisions in *Wallis* and *Calabretta*. Yet, as defendants correctly argue, neither case is directly applicable, as both involved children seized or searched in their homes. *See Wallis*, 202 F.3d at 1134; *Calabretta*, 189 F.3d at 810. *Calabretta* mentioned this distinction in declining to follow the Seventh Circuit's decision in *Darryl H.*, which permitted in-school investigations of child abuse based upon a showing of reasonableness, on the grounds that search and seizure at issue in *Darryl H.* "was not done during an unconstitutional entry into the home." 189 F.3d at 818.

[21] A case directly on point is not necessary to show that a right was "clearly established." *See Anderson*, 483 U.S. at 640. But neither *Wallis* nor *Calabretta* would have put Camreta and Alford on notice that a social worker's warrantless seizure of a child at her school, even in conjunction with a law enforcement officer, could violate the Fourth Amendment. Some other circuits have applied the "special needs" reasonableness standard to investigations of child abuse, *see supra* note 11. The fact that other courts "disagree[ ] about the contours of a right does not automatically render the law unclear," but here, "these differences of opinion from our own are substantial enough to require immunity." *Redding*, 129 S.Ct. at 2644.

[22] The qualified immunity inquiry cannot end there, however. If the defendants' actions were clearly unconstitutional even on the lesser, "special needs" reasonableness standard they regard — incorrectly, as we have held — as applicable, then qualified immunity would not be available. Their actions could not then be said to be "reasonabl[e], but mistaken[ ]" with regard to whether S.G.'s constitutional rights were violated. *Jackson v. City of Bremerton*, 268 F.3d at 651.

[23] Under the lesser standard of reasonableness applicable in "special needs" cases, we conduct a "twofold inquiry" to determine whether a warrantless search is "reasonable": "first,

# App.-32

[we] must consider whether the action was justified at its inception; second, [we] must determine whether the search [or seizure] as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341(internal quotations and citations omitted). Accepting the facts in the light most favorable to S.G., she was kept for two hours in a closed room by two people she did not know: a caseworker and a uniformed police officer carrying a firearm. Applying the *T.L.O.* standard, Camreta and Alford could have reasonably believed that the decision to seize S.G. was sufficiently justified at its inception. Whether they could reasonably have regarded the seizure "as actually conducted" as reasonable in scope is a considerably closer question, for several reasons.

First, neither Camreta nor Alford have provided any explanation for Deputy Sheriff Alford's presence at the interview. Defendants emphasize that Alford "did not participate in the interview" and "just sat there without asking any questions." These assertions support rather than detract from the conclusion that the seizure was not "reasonably related" to defendants' claimed justification for interfering with S.G.'s liberty interests. Nothing in the record — or common sense — suggests that the silent presence of a uniformed, armed police officer at an interview of a child in a grade school is helpful in any legitimate way to determining whether the child needs child protective services.

Second, the justification in the record for a seizure lasting two hours is weak. Most of the cases relied upon by Camreta and Alford do not address such a prolonged seizure. *See Hassan*, 55 F.3d at 1078, 1080 (holding the detention of a student for disciplinary reasons for 50 minutes reasonable); *Doe v. Bagan*, 41 F.3d 571, 574-75 (10th Cir. 1994) (holding caseworker's decision to seize and question student alone in the principal's office for ten minutes reasonable); *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) (holding vice principal's twenty-minute interrogation of student alleged to have

# App.-33

made bomb threat reasonable). To the contrary, these cases held that the challenged seizures were reasonable in scope precisely because they were "brief," noting, for example, that a "ten minute initial interview with a social services case-worker . . . [is] a de minimis interference with [a student's] liberty, insufficient at that stage to trigger constitutional liberty concerns." *Bagan*, 41 F.3d at 575. The seizure of S.G., who was not herself suspected of any crime, lasted considerably longer than that.

Other cases cited by defendants, however, come closer to sanctioning a two-hour seizure, although the circumstances were quite different. *Wofford v. Evans*, for example, involved the investigatory detention of a student who had allegedly brought a gun to school. *See* 390 F.3d at 321. The student claimed to have been detained for an hour and a half while school officials and law enforcement officers searched the school grounds for a gun. The Fourth Circuit held the detention reasonable in scope because "school officials detained the pupil no longer than necessary to obviate [the unacceptable risk of her retrieving the weapon or revealing its location to a peer]." *Id.* at 327; *see also Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 149 (3d Cir. 2005) (finding a detention lasting "no more than four hours" reasonable); *Couture v. Bd. of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1254 (10th Cir. 2008) (holding that a school that had "barricade[d a child] in a closet-like timeout room for one hour and thirty-five minutes" was not unreasonable).

Camreta and Alford seek to justify the length of the seizure by pointing out that as the interview progressed, S.G. began disclosing sexual abuse by her father. S.G. maintains that for "over an hour" she repeatedly told Camreta that her father had never touched her in a bad way until she finally "just started saying yes to whatever he said." It is far from clear that it was reasonable for Camreta and Alford to continue to detain S.G. for an entire hour during which she continually denied such abuse, even if it was reasonable to continue the interview

# App.-34

once she started to say otherwise. Still, there is some case law applying the *T.L.O.* standard sanctioning a detention longer than an hour, and none refuting the justification Camreta and Alford offer for prolonging the detention beyond that — namely, that S.G. was just becoming — in their view — responsive.

We are also mindful of the difficult task facing social services caseworkers, who are required to exercise significant discretion in determining whether a child's welfare is in jeopardy. As the Second Circuit has explained,

> Protective services caseworkers [must] choose between difficult alternatives . . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Tenenbaum*, 193 F.3d at 596 (quoting *van Emrik v. Chemung County Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990)) (alterations in original).

[24] For all these reasons, we hold that defendants in this case are entitled to qualified immunity. We hasten to note that government officials investigating allegations of child abuse should cease operating on the assumption that a "special need" automatically justifies dispensing with traditional Fourth Amendment protections in this context. As noted, we rejected such a claim in *Calabretta*, where state officials argued that "any check on the welfare of children" triggered the "exigent circumstances" exception to the warrant requirement and that seizures conducted during investigations of

# App.-35

child abuse were "administrative searches" subject to some lesser standard of reasonableness. 189 F.3d at 811-12. We have never adopted such an exception to traditional Fourth Amendments standards, and our decision today makes clear that we are unwilling to create an across-the-board exception because a student happens to be seized at a public school rather than on private property.

[25] Because our precedent did not clearly establish that the in-school seizure of a student suspected of being the victim of child sexual abuse can be subject to traditional Fourth Amendment protections, and because, applying the lesser *T.L.O.* standard, the defendants' actions were not so clearly invalid as to strip them of immunity, we affirm the district court's ruling that defendants are entitled to qualified immunity on the Greenes' Fourth Amendment claim.

## C.   THE REMOVAL OF S.G. AND K.G. FROM SARAH'S CUSTODY

The Greenes also argue that their constitutional rights were violated because S.G. and K.G. were removed from Sarah's custody pursuant to a Juvenile Court order triggered by an intentional misrepresentation by Camreta. In an affidavit provided to the Juvenile Court, Camreta stated that "[Sarah] indicated the family had no alternate resources for either the children or Nimrod to ensure there would be no contact." The Greenes maintain that this representation was materially false, contending that (1) Sarah had agreed to Camreta's proposed "safety plan," under which Nimrod would not have any unsupervised contact with his daughters; and (2) Sarah told Camreta that, even though "it would be significantly detrimental to [the] family finances," she had secured "a place where [Nimrod] could stay so that he would have no contact with [S.G. and K.G.]."

Camreta argues that he is entitled to absolute quasi-judicial immunity for removing the children from the Greene home,

# App.-36

A recent en banc decision of this court compels the opposite conclusion.

[26] In *Beltran v. Santa Clara County*, 514 F.3d 906 (9th Cir. 2008) (en banc), we held:

> Parties to section 1983 suits are generally entitled only to immunities that existed at common law. We have therefore granted state actors absolute immunity only for those functions that were critical to the judicial process itself, such as initiating a prosecution. It follows that social workers have absolute immunity when they make discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents. But they are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute. A prosecutor doesn't have absolute immunity if he fabricates evidence during a preliminary investigation, before he could properly claim to be acting as an advocate, or makes false statements in a sworn affidavit in support of an application for an arrest warrant. Furthermore, as prosecutors and others investigating criminal matters have no absolute immunity for their investigatory conduct, a fortiori, social workers conducting investigations have no such immunity.

*Id.* at 908-09 (internal citations and quotations omitted). According to the Greenes, Camreta falsely represented that he had been told the family lacked the financial resources to comply with the safety plan, even though Sarah in fact gave repeated assurances that her husband would live elsewhere

# App.-37

and have no contact with her daughters. Assuming, as we must, that Sarah's version of events is true, under *Beltran* such a misrepresentation falls outside the scope of the absolute immunity afforded caseworkers.

Camreta relies on our pre-*Beltran* decision in *Mabe v. San Bernardino County Department of Public Social Services*, 237 F.3d 1101 (9th Cir. 2001), for the proposition that "social workers enjoy absolute, quasi-judicial immunity when making post-adjudication custody decisions pursuant to a valid court order." *Id.* at 1109 (internal quotation omitted). *Mabe* provides no support for Camreta's position in this case for two reasons. First, the quoted passage refers specifically to post-adjudication conduct, whereas the Greenes allege that Camreta misrepresented the fruits of his investigation before the Juvenile Court's adjudication of the protective custody order. Second, *Mabe* itself distinguished the presentation of false evidence from other, discretionary decisions made by caseworkers during a child abuse investigation: *Mabe* held that "social workers are entitled to absolute immunity for the initiation and pursuit of dependency proceedings," as well as any "post-adjudication custody decisions," but noted that plaintiff's allegations of false evidence in that case failed only "because [plaintiff] failed to offer any evidence of false or perjured testimony" by the caseworker. *Id.*

[27] Camreta is not entitled to qualified immunity as to the false representation claim, as the Greenes' right to be free from judicial deception in securing the removal order was clearly established at the time of Camreta's alleged misrepresentations to the court. We have repeatedly held that "[a] seizure conducted pursuant to a warrant obtained by judicial deception violates the Fourth Amendment." *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007) (citing *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) (per curiam)). "To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of

# App.-38

probable cause." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004), citing *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002). Whether a false statement was "material" to the finding of probable cause is a question of law for the reviewing court. *KRL*, 384 F.3d at 1117; *Butler*, 281 F.3d at 1024.

More specifically, the right to be free from deception in the presentation of evidence during a protective custody proceeding was clearly established at the time Camreta filed his affidavit with the Juvenile Court. In *Devereaux v. Perez*, 218 F.3d 1045 (9th Cir. 2000), for example, we held in the context of a child abuse proceeding that "the constitutional right to be free from the knowing presentation of false or perjured evidence" is clearly established. *Id.* at 1055-56. Even earlier, we stated emphatically that "if an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, . . . he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost." *Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995) (internal quotations and citation omitted); *see also Butler*, 281 F.3d at 1024; *Whitaker*, 486 F.3d at 582 (concluding that "the contours of the Fourth Amendment right against judicial deception" were clearly established by 1996). *See also Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) (holding social workers who deliberately fabricated evidence of child sexual abuse to secure a removal order not entitled to qualified immunity).

[28] The Greenes have presented proof, in the form of Sarah's affidavit and deposition testimony, that Camreta included false statements in his affidavit requesting a protective custody order. According to Sarah, she told Camreta that there was a place for Nimrod to stay so that he would not have any contact with their daughters. Camreta's sworn affidavit states precisely the opposite, claiming that Sarah indicated the family lacked the financial resources to secure alternate housing for Nimrod. These conflicting accounts of

# App.-39

the same conversation create a genuine factual dispute as to whether Camreta intentionally or recklessly misrepresented his conversations with Sarah in an effort to persuade the court to remove the children from her custody.[20]

[29] The alleged misrepresentation was "material" to the granting of the removal order if the Juvenile Court would have declined to issue the order had Camreta been truthful. *See Butler*, 281 F.3d at 1026. The sole evidence presented against Sarah's continued custody of her daughters consisted of Camreta's contested assertion that she was unwilling or unable to prevent Nimrod from having contact with her daughters.[21] There was no basis for the Juvenile Court to remove S.G. and K.G. from *Sarah*'s custody, unless Sarah was failing to take the requisite steps to protect her daughters from Nimrod. "The government may not, consistent with the Constitution, interpose itself between a fit parent and her children simply because of the conduct — real or imagined — of the other parent." *Wallis*, 202 F.3d at 1142 n.14. Camreta's alleged misrepresentation provided crucial evidence for determining whether the girls remained in sufficient danger in Sarah's custody to warrant a protective custody order. In all likelihood, the Juvenile Court would not have issued its order absent Camreta's allegation that Sarah was unable to provide alternate housing for Nimrod.

---

[20]If Camreta did not misrepresent what Sarah told him, or if he negligently misrepresented her statements, his conduct did not violate the Constitution. But whether either is the case is a question for the trier of fact, not for this court. *See Butler*, 281 F.3d at 1024.

[21]This issue is complicated by the fact that the record does not contain any evidence regarding Sarah's response to Camreta's claims at the Juvenile Court hearing. The record indicates that Sarah was present and represented by counsel, and she presumably had an opportunity to rebut Camreta's assertions. Transcripts from the Juvenile Court hearing were not included in the district court record, so it is impossible to know whether or how Sarah responded to Camreta's version of the events at issue. If Sarah essentially ratified Camreta's account of their March 7 conversation at the hearing, Sarah's claim that Camreta intentionally misrepresented her statements to the Juvenile Court would be refuted.

# App.-40

[30] Because Camreta's alleged misrepresentation in support of his request for a protective custody order — again, assuming it occurred — violated the Greenes' clearly established rights, he is not entitled to qualified immunity. The district court's grant of summary judgment to Camreta on the Greenes' Fourteenth Amendment claims stemming from the removal order is therefore reversed.

## D.  THE CHILDREN'S MEDICAL EXAMINATIONS OUTSIDE THEIR MOTHER'S PRESENCE

Finally, the Greenes assert a separate claim under the Fourteenth Amendment premised on Camreta's decision to exclude Sarah from her daughters' physical examinations at the KIDS Center. Specifically, the Greenes argue that Sarah's exclusion violated her "substantive due process right to be there for her children," as well as S.G. and K.G.'s right "to have their mother there when they face potentially traumatic events, such as the exams [performed at the KIDS Center]." We agree.[22]

*Wallis* directly addressed the constitutionality of investigatory physical examinations of children outside their parents' presence. We stated:

> [P]arents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted). Likewise,

---

[22]Camreta initially argued that he was entitled to absolute, quasi-judicial immunity for executing the Juvenile Court's order, but at oral argument conceded that he is not. The concession is well-taken. Camreta was not executing a court order when he made the decision to exclude Sarah from the KIDS Center assessments, as the order said nothing about excluding Sarah from the examinations.

# App.-41

children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations — particularly those . . . that are invasive or upsetting. The interest in family association is particularly compelling at such times, in part because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events.

*Wallis*, 202 F.3d at 1142. This passage from *Wallis* establishes two points central here: first, parents and children maintain clearly established familial rights to be with each other during potentially traumatic medical examinations; and second, this right may be limited in certain circumstances to presence nearby the examinations, if there is some "valid reason" to exclude family members from the exam room during a medical procedure.

[31] Even if Camreta had a valid reason to exclude Greene from K.G.'s medical exam, which we do not decide, *Wallis* held that parents have a right to be present at medical examinations of their children *or* "to be in a waiting room or other nearby area if there is a valid reason for excluding them." *Id.* at 1142. In this case, according to Sarah, she "was ordered by the staff of the KIDS Center, who were under orders of Bob Camreta, to leave the premises" entirely, depriving her of any opportunity to comfort her children even after the examinations had been completed. Prohibiting Sarah from remaining in an adjoining or nearby room violated her constitutional right under *Wallis*.

[32] The language of *Wallis* is clear and unambiguous: government officials cannot exclude parents entirely from the location of their child's physical examination absent parental consent, some legitimate basis for exclusion, or an emergency requiring immediate medical attention. *Id.* at 1141-42. The

# App.-42

KIDS Center assessments involved the visual inspection and photographing of the children's genitals. This process could certainly be emotionally traumatic to a young girl. *Cf. Redding*, 129 S.Ct. at 2642 (citing a study concluding that strip searches can "result in serious emotional damage."). The children's right to their mother's comfort and their mother's right to provide such comfort were thus at their apex. Camreta's decision to exclude Sarah not just from the examination but from the entire facility where her daughter was being examined violated the Greenes' clearly established rights.[23]

[33] We therefore reverse the district court's grant of summary judgment to Camreta on this claim as well.

### III. CONCLUSION

In sum, we hold that Camreta and Alford are entitled to qualified immunity with respect to S.G.'s Fourth Amendment claims and affirm the district court's grant of summary judgment on that basis. With respect to the Greenes' Fourteenth Amendment claims regarding the removal order, we conclude that there is a genuine issue of material fact as to whether Camreta secured the order by misrepresenting his conversa-

---

[23]We note that there was no state administrative rule to the contrary. Oregon Administrative Rule 413-015-0720 sets forth "interviewing rules" for child protective services, providing, *inter alia*, that "[i]f the parent or caregiver is the alleged abuser or if the presence of the parent or caregiver might impede the interview, the CPS worker may interview children independent of their parents or caregivers." OR. ADMIN. R. 413-015-0720(4) (2003). These rules were intended to govern initial interviews with victims of suspected abuse, a point made quite clear by the very next sub-part of the rule, which provides separate guidelines for initial physical examinations. *See* OR. ADMIN. R. 413-015-0720(5) (2003). The State's regulatory scheme thus reflected a concern that the presence of a victim's parents might impermissibly influence the child's answers to a caseworker's questions, not a license to exclude a parent from the premises on which a physical examination is occurring. (These regulations have been revised and now appear at OR. ADMIN. R. 413-015-0420 and OR. ADMIN. R. 413-015-0415.)

# App.-43

tions with Sarah. We therefore reverse the district court's grant of summary judgment on that claim. Finally, we hold that Camreta's decision to exclude Sarah from her daughters' medical examinations at the KIDS Center violated the Greenes' clearly established familial rights under the Fourteenth Amendment. We therefore reverse the district court's grant of summary judgment on that claim as well.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Petition for Panel Rehearing with Suggestion for Rehearing En Banc is proportionately spaced, has a typeface of 14 points or more and contains 4164 words.

DATED: February 4, 2010

/s/ David Thompson
DAVID B. THOMPSON
Senior Assistant Attorney General

Attorney for Defendant-Appellee
Bob Camreta

DBT:blt/1878950

JOHN R. KROGER
Attorney General of Oregon
JEROME LIDZ
Solicitor General
DAVID B. THOMPSON
Assistant Attorney General
1162 Court Street N.E.
Salem, Oregon 97301-4096
Telephone: (503) 378-4402

Counsel for Defendant-Appellee Bob Camreta

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| SARAH GREENE, personally and as next friend for S. G., a minor, and K. G., a minor, | U.S.C.A. No. 06-35333 |
| Plaintiff-Appellant, | |
| v. | |
| BOB CAMRETA; DESCHUTES COUNTY; JAMES ALFORD, Deschutes County Sheriff; BEND LAPINE SCHOOL DISTRICT; and TERRY FRIESEN, | STATEMENT OF RELATED CASES |
| Defendant-Appellee. | |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of

Appeals for the Ninth Circuit, the undersigned, counsel of record for defendant-

/ / / / /

/ / / / /

/ / / / /

/ / / / /

appellee Bob Camreta, certifies that he has no knowledge of any related cases pending in this court.

Respectfully submitted,

JOHN R. KROGER
Attorney General
JEROME LIDZ
Solicitor General

/s/ David Thompson

DAVID B. THOMPSON
Senior Assistant Attorney General

Attorneys for Defendant-Appellee
Bob Camreta

DBT:blt\1878950

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2010, I directed the Petition for Panel Rehearing with Suggestion for Rehearing En Banc to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Mark P. Amberg
Deschutes county Legal Counsel
1300 N.W. Wall Street
Suite 200
Bend, Oregon 97701
 Telephone:  (541) 330-4645

Mark H. Wagner
Hoffman, Hart & Wagner, LLP
1000 S.W. Broadway
Suite 2000
Portland, Oregon 97205
 Telephone:  (503) 222-4499


/s/  David Thompson
_____
DAVID B. THOMPSON
Senior Assistant Attorney General

Attorney for Defendant-Appellee
Bob Camreta

DBT:blt/1878950